# ALEXANDER v. ALEXANDER.

1. The guardian of a lunatic, under our statute, has the same powers, and is subject to the same restrictions, as the guardian of an infant.

2. A guardian cannot charge his ward's estate with any counsel fees he may choose to pay ; it must appear that the services were required, and the compensation such as is usual, and customary for such services. Where no proof is made, it is competent for the chancellor to determine the value of counsel fees in his own Court, and this Court will not revise his decision.

3. An agreement to receive the services of a negro, for the board of an individual, is not cancelled by the slave becoming sick before the time expires.

4. A guardian cannot charge a commission for the custody and safe keeping, of either money, or *choses in action.*

5. The value of the board of a lunatic, depends upon his condition, and the care, attention, and watchfulness, necessary to be bestowed upon him, to be ascertained by proof. Declarations of persons, " that they would not board him for $500 a year," is not proof that it was worth that sum.

6. When a party to a suit in chancery, is examined before the master, upon an account taken by him, his answers to the points upon which he is examined, are evidence for him ; he cannot introduce irrelevant matter as to which he is not questioned, and make it evidence for him. The statute authorizing a party to prove items not exceeding $10, by his own oath,

Alexander v. Alexander.

has no reference whatever to the practice in chancery, when a party is required by the chancellor to submit to an examination before the master.

7. In transporting the lunatic from place to place, it is the duty of the guardian to select the cheapest mode consistent with the comfort and safety of the lunatic; if the public conveyance is suitable, and cheaper than a private one, it is his duty to take it.

8. To authorize a charge for attention to a sick negro, it should be shown how long he was sick, and the nature and value of the attention bestowed upon him.

9. An account receipted for the board of the lunatic, is not a sufficient voucher, without proving, that the services were rendered, the money paid, and the charge reasonable.

10. Acts done by the guardian, without authority, on account of the ward, will not bind the ward, unless beneficial to him. Therefore, when the guardian of a lunatic, undertook to commence the business of planting on behalf of the lunatic, purchasing mules, provisions, &c., and the enterprize proved unfortunate, he was held responsible for the hire of the slaves. It was the duty of the guardian, if he considered it more beneficial to the lunatic to work the slaves, than to hire them out, to apply to the proper tribunal for authority so to act.

11. Where the guardian made an exchange of two of the slaves of the lunatic's estate, those interested in the estate, had the right to disaffirm the contract, and charge him with the value of the slaves so exchanged.

12. The appropriate function of an exception to a master's report, is, to point with distinctness, and precision, to the error complained of. An objection to the result attained by the master upon the settlement of an account, is too general to be noticed. It is the duty of the party objecting, to except to the particular items allowed, or refused, and it will then be the duty of the master, to certify the evidence by which the disputed item, was admitted or rejected.

13. When costs are directed to be paid out of the estate, if the litigation is unnecessarily protracted, for the purpose of vexation, the Court will apply the proper corrective, by taxing the party so acting, with the costs.

Error to the Chancery Court at Montgomery.

THIS case comes here upon exceptions to the master's report, in two cases, heard together, by consent; one filed by the plaintiff in error, as guardian of a lunatic, to dissolve the marriage; the other, by the wife, for a divorce and alimony. The chancellor decreed the marriage valid, and taxed the complainant with the costs. This decree was so far modified by this Court, as to

require the costs to be paid out of the lunatic's estate. An account being ordered of the lunatic's estate in the hunds of the guardian, the master reported, rejecting many of the charges set up by the guardian, to which he filed twenty-two exceptions, and the wife five. The chancellor overruled most of the exceptions of the complainant, and sustained three of those made by the wife of the lunatic, which is now assigned for error, but which need not be noticed further, than they are in the opinion of the Court.

Tho. Williams and J. P. Saffold, for plaintiff in error.—A comittee of a lunatic is entitled to an allowance for his services in receiving and disbursing money, &c. [3 Johns. Ch. 43.] He is permitted to employ counsel to aid in the management of the estate, and is allowed the costs of suit. [4 Dess. 394.]

The maintenance of a lunatic ought always to be ample, and in proportion to the estate of the party, and increase with the increase of the estate. [23 Law Lib. 107 ; top page, 1 McCord's Ch. 4.]

A trustee may employ agents, [Lewin on Trusts, 448, 449, 451,] and is only required to act as prudently for the trust, as he would have acted for himself. A trustee acting in good faith, is entitled to a prompt indemnity for his necessary disbursements. [6 Johns. C. 62 ; 2 McCord's Rep. 82 ; 1 Gill & J. 273 ; 2 Bland, 409.]

Hayne, contra.—The account presents the startling fact, that in four years, an estate amounting to $7766, and of the average annual value of $970, has been reduced by the management of the guardian, to $4,720.

It is in proof, that the guardian said he intended to consume the estate in litigation ; and we find that he has already paid $800 in counsel fees, and upwards of that sum in costs of Court; and has made charges in his own favor of about $3,300. An examination of the testimony will show an utter disregard of the interests of the lunatic, and an attempt to use the property for his own benefit, and that the decision of the chancellor is strictly correct.

ORMOND, J.—The chancellor, in acting upon the decree, made in this cause, when it was formerly before this Court, [5 Ala. 520,] where it was held, that the costs of the proceeding

Alexander v. Alexander.

must be paid out of the estate of the lunatic, understands it to mean, " that all reasonable. and necessary costs, and expenses, incurred by either of the parties, in prosecuting, or defending the suits, should be paid out of the estate of the lunatic." This is doubtless a correct exposition of the rule laid down by this Court, which was made in reference to the suit instituted by the guardian of the lunatic, to dissolve the marriage. As it respects the settlement of the accounts of the guardian of the lunatic, the act of 1819 ascertains what shall be his powers, duties, and responsibilities, and declares, " that he shall have the same power, to all intents, constructions, and purposes, and be subject to the same rules, orders, and restrictions, as guardians of orphans."

We shall take up the exceptions in the order they are found in the record. The first relates to the rejection by the Chancellor, of the allowance by the Master, of $800 as counsel fees, which was reduced by him to $300. It is urged, that as there was no evidence of the nature of the services, the Chancellor had no means by which to determine, whether the allowance was correct or not, and that the allowance made by the Register, must be presumed to be correct *prima facie.*

We take it to be a clear proposition, that a guardian cannot charge his wards estate, with any counsel fee he may choose to pay, but that before he can be allowed the benefit of money thus paid, in his account with the ward, it must appear in some mode, that the compensation thus allowed was reasonable and proper. No proof having been made, it was doubtless competent for the Chancellor to determine the fact of the reasonableness of the compensation, for professional services in a case depending in his own Court. Nor has this Court the means of determining, that his decision is not correct. As the guardian required the assistance of counsel to enable him to conduct the cause, he would doubtless be compelled to pay such compensation as was usual, and customary for such services—and if thus paid, it should have been allowed him ; but there is no such proof, and we cannot perceive from any thing in the record, that the allowance of three hundred dollars, made by the Chancellor, was not a fair and adequate compensation.

2. The Register reported that many of the expenditures of the guardian were unreasonable and unnecessary, and that the reduction of the estate in the guardian's hands was unwarranted,

Alexander v. Alexander.

&c.   This was excepted to, and properly overruled by the Chancellor, as it presented no point for determination, being merely introductory to the examination of the particular items of the account, which were afterwards rejected.

3. The 3d and 4th exceptions, are for rejecting a charge of $125, for boarding Ethelbert Alexander, (the lunatic,) two and a half months, and $20 for the board of a negro girl named Lish, for the same time.   It appears from the exceptions and the testimony, that there was an agreement to take the services of the negro for the board of the lunatic.   This was in the year 1839, whilst he was able to contract, and we think with the Chancellor, that if, as appears to be the fact, there was such a contract, it was not cancelled or rescinded by the negro afterwards becoming sick, and of no value, any more than it would have been if the contract had beeen to pay for her services in money.

4. The fifth exception relates to the rejection by the Register, of the charge of two and a half per cent, for keeping the notes belonging to the lunatic.   Guardians are entitled to a fair compensation for their receipts and disbursements, but there is neither law or usage, which will justify their charging a commission for the mere safe keeping of money, and *a fortiori*, not for the custody of securities for money.   This exception was properly overruled.

5. The guardian having charged the lunatic at the rate of fifty dollars per month for his board, the register reduced the compensation to $250 *per annum*, that being the rate of boarding at the Lunatic Assylum, in South Carolina.   The Chancellor sustained this exception, so far as to allow $400 per annum, justly observing, that the rate of boarding established at a public institution in another State, could afford no criterion of the value of board in a private family in Alabama.   The value of the board of a lunatic, must depend upon his condition, and the care, attention, and watchfulness necessary to be bestowed upon him.   This, it is obvious, is matter of proof, but there is no testimony which is satisfactory upon this point.   The witnesses do not state, what the value of the board of this person was, but say, that *they* would not board him for less than five or six hundred dollars a year—and we do not doubt witnesses might have been found in abundance, who would not have boarded him for twice that amount. This is no criterion of its value, and we cannot therefore say,

that the allowance made by the Chancellor, is not ample. So far indeed as we can judge, from the account given of the lunatic by the witnesses, it appears to be sufficiently liberal, as he was not a furious madman, requiring constant attention, and in fact did not receive it.

6. The Register rejected the charge of $30, for keeping three horses two months, assigning as his reason, that there was no proof of the fact, but the testimony of the guardian himself. The Chancellor sustained the rejection, upon the ground, that the guardian was not competent to prove items in his own account, above the sum of ten dollars.

The defendant was examined as a witness, by the direction of the Chancellor, in the interlocutory decree, directing an account to be taken. The design of the statute (Clay's Dig. 352, § 43) authorizing a party to prove items not exceeding ten dollars, by his own oath, has no reference whatever to the practice in Chancery when a defendant is required by an order of the Chancellor to submit to an examination as a witness. In Hart v. Ten Eyck, 2 Johns. Ch. 513, Chancellor Kent says, a reference in such a case, under the usual order, has the effect of a supplemental bill of discovery, and in Templeman v. Fauntleroy, 3 Rand. 444, it is said, " the examination has the same effect, as that of an answer to the bill." To the points then, to which the guardian, as defendant, was examined by the wife and child of the lunatic, his answers are evidence for him, precisely, as they would have been in an answer to a bill for a discovery. He cannot give evidence for himself upon matters to which he is not examined by the opposite party. [Armsby v. Wood, Hopkins C. Rep. 229.] As it does not appear that the guardian was examined as to this charge in his account, by the opposite party, his testimony was properly rejected by the register.

7. The eighth exception relates to the rejection of the charge made by the guardian, for conveying the lunatic to Columbia, S. Carolina. The allowance made by the Register was the cost of travelling by the public stage, and two dollars a day for the trouble of the guardian. It appears from the testimony that the lunatic was not a furious madman, and it is evident that he could have been conveyed as well by the stage coach, as by private conveyance. Indeed the latter would be the cheaper mode, though in this case it seems that it cost more. It was the duty of

101

the guardian to select the cheapest mode, consistent with the comfort and safety of the lunatic, and he cannot be allowed more.

8. We think with the Chancellor, that the charge of forty-five dollars for attention to Silas, is not sufficiently proved. It is not shown how long he was sick, nor how much it was worth. The whole amount of the testimony is, that the guardian, " charged $45 for attending to Silas nine months, during which time he was sick." This is too general, vague, and indefinite, to authorize the Register to make the allowance. It should have been shown how long he was sick, and what was the nature and value of the attention bestowed upon him.

9. The 11th exception is for sustaining the Register, in rejecting a claim for $182, (voucher 12,) money paid to one Doster, for board, &c. of the lunatic, for the year 1839. The Register rejected this because there was no proof other than the account of Doster, receipted, that the board was furnished, and because the item was contradicted by other facts in the record. The Chancellor appears to have considered, that the item was proved by the guardian himself. Upon looking into his testimony, we are unable to find any such proof. He says, " In 1839, Ethelbert boarded with me five or six months ; $182 was a fair compensation for his board that year." This is certainly not proof of the fact, and the account of Doster, is for the entire year, at a given rate per month. Before this item could have been admitted, it should have been proved, that the services were rendered and the money paid ; also, that the charge was reasonable. These facts are not shown by the production of the receipt, but on the contrary, as the Register remarks, it is contradicted by other parts of the testimony and facts in the cause. This exception was therefore properly overruled.

10. The 11th assignment is, that the Chancellor erred in overruling the 13th exception, which was for rejecting the account of 1842, being the result of the labor of the slaves for that year, and charging him with hire, without proof of the value of the hire. It appears that the guardian hired out the slaves, in 1840, and 1841, but that in 1842 he undertook to work them for the benefit of the lunatic, purchasing mules, provisions, &c. These, it appears, the guardian purchased from himself, and upon the breaking up of the establishment, and sale of the property, became

again himself the purchaser at a greatly reduced price. By this operation, as might have been expected, the estate of the lunatic sustained considerable loss. We entirely agree with the Chancellor, that this proceeding is wholly unjustifiable. Independent of the manner in which the guardian conducted the matter, by buying from and selling to himself, a course of conduct necessarily leading to abuse, and which could not be tolerated, it was the duty of the guardian, if he considered that the interest of the estate required that the slaves should not be hired out, but should be employed in this mode, to have applied to the appropriate tribunal, for the necessary authority—an authority, which we think no Court, under the circumstances of this case would have granted. The cases must be very rare, where an estate in the absence of its owner, will be made to yield what the slaves would have hired for. The general rule is, that acts done by the guardian without authority, will not bind the ward, unless beneficial to him. [Macpherson on Infants, 329, and cases there cited.] Doubtless, there may exist cases, where a guardian finding his ward in possession of an estate in lands and slaves, would be justified in keeping the estate together, and working it for the benefit of the infant; and upon an enlarged view, this might be most beneficial to the minor. That is not this case. Here the slaves had been previously hired out. To commence the business of planting, a considerable outlay was necessary, in the purchase of mules, plantation utensils, &c., and this too, with the strong probability existing, that the enterprize would not yield, what would be realized, by the more simple, and customary mode of hiring out the property. Upon every view which we are able to take of the case, we are satisfied the decision of the Chancellor was correct —that this project, by which the property was diverted from its natural, and customary channel, to a difficult, and to say the least, doubtful experiment, though done in good faith, was at the risk of the guardian, and he must sustain the loss. The further objection urged, is, not that the hire was charged at too high a rate, but that there was no testimony of its value. The evidence was of the value of the hire, the two preceding, and the succeeding years, from which, certainly, a just inference might be drawn of its value during the intermediate period. And if put down by the Register at too high a rate, might easily have been corrected below.

Alexander v. Alexander.

11. The 12th assignment is, that the Chancellor overruled the 14th and 15th exceptions, that the Register charged the guardian with the value of two .slaves, which he had exchanged for other negroes.

The guardian had no authority whatever to make the exchange of the slaves, Ned, and Malinda, and upon the principles laid down in regard to the previous exception, acted therein at his peril, and subject to have his contract affirmed, if beneficial to the estate, and disallowed if not.    Here it appears to be the interest of the estate to disaffirm it ; such is the opinion of the Register, and such is also the opinion of those representing the interests of the wife and child.    This was sufficient evidence for the Chancellor, and is for this Court, of the true interest of the estate.    He was therefore properly charged with their value, of which there was abundant testimony.

12. The 13th assignment relates to the charge against the guardian, of $8,324 43, of notes, contrary to the proof.    This, which was the 20th exception to the Master's report, the Court rejected for its generality, and because it imposed on the Court the necessity of examining a great mass of evidence, without pointing out where the error was.

It is most undeniable, that the appropriate function of an exception is, to point with distinctness, and precision, to the error complained of.    It is too much to ask of the Court, to grope through a vast mass of testimony, and documentary evidence, in search of an error, which.is alledged to exist somewhere, and by connecting in this instance, the accountant with the Judge, to ascertain what the error is.    For it is not stated in the exception, what is the true amount of the notes, in the hands of the guardian.

Upon looking into the account presented by the guardian, (as we presume it to be,) he charges himself with notes of the estate and interest to January 1, 1840, to the amount of $7,633 83, describing each note particularly.    The Master presents as the result of the testimony, a schedule, which accompanies his report, by which he charges the guardian—

| | | |
|---|---|---|
| January 1, 1840, with notes, property of the ward, | $8,324 | 43 |
| Subtract guardian's credit, | 197 | 52 |
| | | |
| Amount due to ward, January 1, 1840, | $8,126 | 91 |

It was sufficient for the Master to state the result of his finding, and if the opposite party was dissatisfied with the amount thus stated, it was his duty to except to such items as he considered improperly charged; it would then have been the duty of the Master to certify the evidence by which the disputed item was sustained. This not being done, and a mere general objection made to the Master's conclusion, it is impossible for the Chancellor, if he was willing to encounter the labor, to investigate the matter with any approach to certainty. The exception was therefore properly overruled. [See Kirkman v. Vanlier, 7 Ala. Rep. 227.]

13. The 14th assignment of error, is the overruling the 21st exception to the report of the Master, charging four months hire for the slave Silas. Upon what testimony this charge was made, does not appear. It does appear however that the guardian had possession of the slave at the commencement of the year, and the proof when he became blind and of no value, should properly have come from the other side. In the absence of any such proof we cannot say the charge is incorrect. The presumption must be, that such proof was made, otherwise it would have been the duty of the Register, to have charged hire for the entire year.

The last assignment, calling in question the result of the Master's report, need not be considered, as we have anticipated it, in the examination of the various parts, of which it is composed.

The result of this protracted examination is, that the decree of the Chancellor must be affirmed. According to the former decision of this Court, the costs were to be paid out of the estate, upon the presumption that the litigation was *bona fide*. From some evidence found in the record, it would seem to be doubtful, whether the guardian was not unnecessarily protracting the controversy, for the purpose of vexation. If this was clearly made out, we should not hesitate to apply the proper corrective, by taxing him with the costs. We do not think however, the evidence sufficiently strong to warrant this course. Let the costs be paid out of the estate in the hands of the guardian, except the costs of this court, which will be paid by the plaintiff in error.

Since the decree rendered in this cause, at the present term, a motion has been made by the counsel for the plaintiff in error,

to modify the decree, as it regards the fees of the solicitors, reduced by the chancellor, upon the ground that the exception taken before the master, was not to the amount of the allowance, but to its being a charge upon the estate ; that the decree of the chancellor was made in vacation, and they had not therefore an opportunity to make this explanation, or procure the necessary proof of the reasonableness of the charge ; and this being admitted by the solicitors of the defendant in error, and they assenting to the proposition, it is ordered, that the decree heretofore made by this Court, be so far modified, that the cause be remanded, that a reference may be made to the master, to ascertain whether the fees paid to the solicitors were reasonable, and proper, and such as is usual in such cases.