## SPENCE, a slave, vs. THE STATE.

1. A juror, whose sole property in slaves consists of an undistributed share in an estate composed of slaves, is not a slaveholder within the contemplation of the statute, and is incompetent to sit as such on the trial of a slave for a capital offence.

2. On the trial of a slave for a capital offence, the master is a competent witness for him.

3. Where it is shown that a slave was arrested, tied, and left by his master in charge of a third person, to whom he immediately after made a confession, proof that the master "had always been in the habit of tying his slaves, when they were charged wi h any matter, and whipping them till they confessed the truth, and that he had frequently treated the prisoner in the same way," is competent, and should be considered by the court in determining whether the confession was induced by the influence of hope or fear.

Error to the Circuit Court of Choctaw. Tried before the Hon. John Bragg.

HUNTINGTON, for the plaintiff in error.

ATTORNEY GENERAL, contra.

CHILTON, J.—This was an indictment against the plaintiff in error, the property of one Thomas G. Cole, for the murder of John Ramsey, tried in the Circuit Court of. Choctaw county. The defendant below was found guilty and sentenced to be executed on the second Friday in February 1850. Upon the trial, a bill of exceptions was sealed by the presiding judge, which presents the following points for our consideration:—
1. Was Scurlock a competent juror? 2. Was Cole, the owner of the slave, a competent witness to give evidence in favor of the slave? 3. Should the proof proposed to be made by him have been received by the court as conducing to show that the confessions of the prisoner were not voluntarily made?

1. By the 10th section of the 15th chapter of the penal code, (Clay's Dig. 473, § 10,) it is provided that upon the trial of slaves for capital offences, they shall be entitled to twelve peremptory challenges, and the State to four, "and at least two-thirds of the jury shall be slaveholders." In this case, eight jurors having been sworn—four of whom were slaveholders and

four non-slaveholders,—and the prisoner having exhausted his challenges, Scurlock was presented as a juror, who stated on oath that he did not then hold any slaves, but that his father was dead and that his estate was under administration, but no settlement or distribution had been made; that said estate owned several negroes, and that there were five or six distributees; that upon the settlement of the estate, he expected to receive some slaves as his distributive share. Was he a slaveholder in the contemplation of the statute? We need not stop to enlarge upon the objects the Legislature had in view in the enactment of the provision above refered to. It is manifest that both the State and the slave may be deeply interested in having a majority of two-thirds of the jury slaveholders—persons supposed to be familiar with this species of property, to have obtained a knowledge of their peculiarities and idiosyncracies from personal observation, as also to be interested from the fact of holding slaves in preserving the rights growing out of the relation of master and slave. We are clear in the opinion that this juror did not possess the requisite qualification—that he was not a slaveholder in the sense contemplated by the act of the Legislature. He held no slaves—he might never hold any. He expected upon the happening of a future event, the distribution of his father's estate among sundry distributees, of whom he was one, to become a slaveholder. But before that time they might die; they might be sold for the purpose of a more equitable distribution; many circumstances might occur which would prevent either the legal title or the possession ever vesting. The statute means something more than a mere property qualification; it is not satisfied with an interest merely in slaves, which slaves never have been and never may be *actually held* or *possessed* by the juror—as, for example, an interest in a slave, with the possession postponed until the termination of a life estate in a third person. Had the framers of the law meant that such an interest would qualify the juror, instead of the strong expression used that "at least two-thirds of the jury shall be *slaveholders*," they would doubtless have inserted that *two-thirds should have some interest in slaves, either in possession or expectancy.* We think the Legislature used the term "slaveholders" in its popular sense—that in which the juror, Scurlock, seemed to understand it, when he said he was not a slaveholder *then*, but ex-

pected to be upon the distribution of his father's estate. They meant that the paaty himself, or by his bailiff, should have *possession* of a slave or slaves in which he had an interest. It is then he is supposed to possess the sympathies and qualifications required by the spirit of the enactment, and prepared to sit as a juror upon a trial involving the life of the slave.

We might here close this opinion, but as the case must go back for another trial, it is necessary that we decide the other questions presented.

2. Is the master a competent witness for the slave? This question has never before been decided by this court, and we have given to it all the consideration which the time allowed us and our duties in respect to other business before the court will justify. That the master is an interested witness, when offered in favor of the slave, there can be no doubt; this is conceded by the counsel for the prisoner. But it is insisted by him, that in capital cases the right of property which the master has in the slave should not deprive him of the benefit of the master's testimony. This precise point nas been settled by several adjudications in other States, and although we might entertain doubt as to the correctness of some of the reasoning upon which these decisions rest, yet we do not feel inclined to dissent from them. In Elijah, a slave, against The State, 1 Humph. Tenn. Rep. 102, Rice, J. in delivering the opinion of the court, says—"In cases like this, the law upon high grounds of public policy pretermits for a moment the relation of master and slave, takes the slave out of the hands of his master, forgets his claims and rights of property, * * * * and gives him the benefit of all the forms of trial which jealousy of power and love of liberty have induced the freeman to throw around himself for his own protection;" and he adds, that on grounds of public policy, of common humanity, of absolute necessity, the master must be held to be competent either for or against his slave; that while on the one hand society will not allow him, from considerations of public policy, to say that he has an interest and therefore should not be compelled to give testimony to convict the slave, so on the other humanity forbids that society should say to the master that having an interest he should not be allowed to prove a fact in his favor. In the case of Isham, a slave, against The State, decided by the Court of Appeals in Mississippi, reported in 6 How. 41,

the same doctrine is held.   Sharkey, C. J. in delivering the
opinion, says—"What would be the condition of the slave, if
that rule which binds him to perpetual servitude should also
create such an interest in the master as to deprive him of the
testimony of that master?   The hardship of such a rule would
illy comport with that humanity which should be extended to
that race of people.   In prosecutions for offences, negroes are
to be treated as other persons, and although the master may
have an interest in his servant, yet the servant has such an in-
terest in the testimony of his master as will outweigh mere pecu-
niary considerations; nor can he be deprived of that testimony
from the accidental circumstance that in a civil point of view he
is regarded by the law as property."   It appears also from a case
cited by the court in Elijah v. The State, *supra*, that the same
point came before the court in New Jersey, (Aaron v. The State,
1 Sou. Rep.) and was decided in the same way.   Opposed to
these decisions we find but one, The State v. Charity, 2 Dev.
Rep. 543, in which a majority of the court, per Ruffin, J., say
the rule, which excludes a person from being a witness who is
interested, " less frequently applies to public prosecutions than
to civil actions, because it cannot often happen that private rights
are directly involved or can be consequentially affected by ver-
dicts on indictments, but when they are, the rule prevails in one
case, as well as in the other, subject to a few certain exceptions
of necessity, or of statute provision."   So in that case the ma-
jority held that the interest of the master in his slave being di-
rect and immediate, he (the master) could not be compelled to
give evidence unwillingly against his slave.   It will be discov-
ered that the case from North Carolina is not altogether analo-
gous to the one under consideration.   Besides, in that case, the
chief-justice of the court dissented, and his reasoning upon this
point in the cause, in our opinion, shows that the opinion of the
majority cannot be sustained.   He affirms that the interest at
stake is so essentially different from that which is brought
forward to protect the witness from giving evidence, or to ex-
clude him if willing, that it is not to be weighed in the balance
with mere pecuniary interest; that it is so transcendent in its
nature that its *weight* is not to be ascertained by mere *money bal-
ances*.   He adds—"I know of no case of life and death where
interest *excluded* a witness."   This court, in the case of The

State v. Marshall, a slave, 8 Ala. Rep. 302-4, held that the owner of the slave is a competent witness for the State upon the trial of the slave for a capital offence, and the opinion proceeds upon the ground that the master was swearing against his own interest.    With the result attained in that case we are entirely satisfied, but we are inclined to place the competency of the master upon the high ground that society on the one hand, and the slave whose life is at stake, on the other, have each an interest in the master's testimony, compared with which the pecuniary interest of the master sinks into insignificance, and should not be regarded except as affecting the credit to be given to it.    The error of those who would place the exclusion of the master on the ground of interest results, in my judgment, from a misapplication of the principles of the common law, which forbid with a few exceptions an interested witness from testifying in favor of his interest to cases like this, which never did and never could have arisen in England, since slavery as it exists here was unknown to the common law.    It is true that villeins appendent and in gross of the feudal times, in the relation which they bore to their masters, though free as to all the world beside, may furnish some analogy to our slaves; but if we turn to that relation we shall be wholly unable to find in the records of those ruder times any adjudicated case holding that when the villein was upon trial for his life, the lord, though having a property in him, was incompetent to testify in his behalf.    But, in my view, if we seek for analogies at the common law, those nearest approaching the case before us are favorable to the master's competency—such as masters interested in the services of their apprentices, persons entitled to rewards from government upon the prosecution and conviction of offenders, or to a restoration of property stolen, and the like; but it is said that these being given by the statute, it is virtually implied that the competency of those interested and who are offered as witnesses is continued.    But this cannot be affirmed of persons entitled to private rewards, who are also admitted upon grounds, it is said, of public policy,—1 Greenl. Ev. sec. 412,—society having an interest in the testimony which no private arrangement between the parties can be allowed to divest.    But without further elaborating the point, which has been fully discussed in the cases to which we have refered, it is sufficient to say that

in our opinion the master was a competent witness, and should not have been rejected on the ground of interest.

3. But it is agreed that the proof proffered to be made by him was not legitimate, and that although he may have been excluded for a wrong reason, this court should not reverse, because the prisoner has not been injured. We will briefly consider this question. It appears that during the progress of the trial it was made to appear that the prisoner was arrested by his master at the house of the latter; that his master immediately had his hands tied, and that in a few minutes the slave made certain confessions to a third person with whom his master had temporarily left him. These confessions it was proposed to offer in evidence against the slave. For the purpose of showing that they were made under fear of punishment, the prisoner's counsel proposed to prove by the master and owner, "that he (the master) had always been in the habit of tying his slaves when they were charged with any matter, and whipping them till they confessed the truth, and that he had frequently treated the prisoner in the same way." That the testimony above offered was proper for the consideration of the court, we do not entertain the least doubt. The preliminary question before the court was, whether the confessions of the prisoner were influenced by the dread of apprehended punishment. In order to settle this the judge should be advised fully of the circumstances under which they were made. Had the slave reasonable ground to apprehend from his former treatment that he was to be whipped and confessions extorted from him, as the master was in the habit of doing? Was the conduct of the master on this occasion the same as on former occasions? Was it such as that the slave, under all the circumstances, may reasonably be supposed to have been influenced by it in making the confession of his guilt? To arrive at a proper understanding of these and the like inquiries, the proof offered was entirely proper, as it is most evident it *tends* to show that the confessions were not made without the appliances of hope or fear.—1 Greenl. Ev. § 219. The question whether confessions should go to the jury as voluntarily made, or be rejected as drawn from the prisoner by hope or fear excited by another person, being a matter, as Mr. Greenleaf says, (vol. 1, § 219,) resting in the discretion of the judge, it is for him to determine from the consideration of the

condition of the prisoner, the manner of his treatment, his character and the like, whether his confessions are proper to be received against him. If the master was in the habit, when the prisoner was supposed to have done wrong, to tie him and whip him until he confessed, is there any thing unreasonable in the proposition that the slave, being now seized and tied by him, should suppose that a similar punishment was about to follow, and that the temporary absence of the master was but to provide the means of torture which his confessions might avert? We express no opinion whether the confessions made by the slave were influenced by any such consideration; for this is a point upon which, as *explained by the testimony of the master*, the court below did not decide. All that we now decide is, that the proof proposed to be made by the master was legitimate, as tending to show whether the confessions were voluntary or otherwise.

Let the judgment be reversed and the cause remanded, that the prisoner may be again tried.