# Supreme Court of Florida,

AT

# AN ADJOURNED

# APRIL TERM, 1855,

## HELD AT TALLAHASSEE.

---

RICHARD MAIBEN, TRUSTEE, ET. AL., APPELLANTS, VS. FRANCIS BOBE, APPELLEE.

1. Where a deed of gift in trust for the separate use of a married woman was made in Alabama, by parties living there at the time of its execution, the laws of that State as to the rights of the parties under it, as administered by her judicial tribunals form the rule of decision of the case. Her Courts having adopted the English rule as to the right of disposition of the *feme* in a case where there was no restriction or discretion in the instrument, their ruling was held applicable and conclusive as to the rights of the parties

*a.*

2. In a deed of gift of property to the separate use of the wife, having no words restriction or direction as to alienation, the power of disposition is incident of to the ownership, and she may dispose of it as if she were a *feme sole.*

3. The English and New York rule to this extent, approved and adopted.

4. A married woman will not be protected or sustained in a course of double dealing, calculated to involve an innocent purchaser, and throw upon him the loss to arise from improper action of her husband.

Appeal from a decree of the Circuit Court for Escambia County.

Bobe, the appellee, filed his bill in the Court below, against Rosanna Shemo and Richard Maiben, as her Trustee, and Joseph Shomo husband of said Rosanna, to perpetually enjoin a judgment obtained by said Trustee in Escambia Circuit Court. The judgment sought to be enjoined, was for the value of certain negroes, previously purchased by Bobe from Shomo and his wife, but which were claimed to belong to said Maiben, as Trustee of said Rosanna Shomo. The bills of sale to Bobe, were executed by Rosanna Shomo, whose husband, Joseph Shomo, appended thereto, a relinquishment of all his right and title to the slaves.

The bill alleges that Rosanna Shomo received the purchase money for the slaves, and that the same was their full value. That when the said Shomo and wife, came to Florida, they brought the slaves in question, and in order to deceive and defraud complainant and others, also brought with them a deed of gift of said slaves, from one David Tate to said Rosanna Shomo, which *for the same purpose,* was put on record in Escambia County. That in the year eighteen hundred and thirty-one, on the application of Joseph and Rosanna Shomo, the said Maiben, was appoin-

ted by the Circuit Court of Baldwin County, Alabama, Trustee of said Rosanna Shomo, to protect and enforce the trust supposed to be created by the deed of gift from David Tate to said Rosanna; that complainant had no knowledge of the said record, or of the appointment of said Trustee, until at the trial of the suit at law against him, and therefore insists that he, complainant, is a *bona fide* purchaser, without notice or knowledge of the said trust, so as aforesaid created.

The complainant annexed as an exhibit to his bill an authenticated copy of the deed from David Tate to Rosanna Shomo, which is as follows:

BALDWIN COUNTY, }
State of Alabama. }

For and in consideration of the love and affection I bear to my sister, Rosanna Shomo, and in accordance with my previously expressed intention, I do hereby give and bestow on my said sister, Rosanna Shomo, and to the heirs of her body, the following property, to wit : (naming them,) not to be subject to the control, or debts, or contracts of her husband Joseph Shomo, and in case of a further marriage, or marriages of my said sister, Rosanna Shomo, the above named property is not to be subject to the control, debts or contracts of any future husband or husbands, but it is my intention that the negroes above named, be solely invested as the property of my said sister, Rosanna Shomo, and the heirs of her body. Signed, sealed and delivered this fifthteenth day of November, A. D., Eighteen hundred and twenty-nine.                         DAVID TATE.

In presence of
P. R. TURNSTALL, }
WM. C. VAUGHN. }

This deed or bill of sale, was recorded in Alabama, and also in Escambia County, Florida, and is the deed under which Maiben, who as appears by the record, was appointed by the Circuit Court of Baldwin County, Alabama, Trustee of Mrs. Shomo, claims title.

Mrs. Rosanna Shomo answers separately and claims, that the negro slaves in controversy, were conveyed for her separate use.   She alleges that the deed of trust was recorded in the proper office, shortly after her arrival in Florida, and that at the same time, the transcript of the appointment of Trustee was handed the Clerk to be also recorded, but he refused to record the same, because it was not the original, but a mere copy.

She further says, that she never made any contract of sale of the slaves in question, with complainant, and never had any negotiations for that purpose.   She admits that she signed the bills of sale for the slaves to complainant, but declares that she did so under the coercion and threats of her husband, who stated to her that unless she signed the bills of sale, he would run all her negroes to New Orleans and sell them ; that she never received one cent of the purchase money from complainant or any one else.   She avers that a fraud was perpetrated upon her rights in regard to said slaves, and that complainant knew that her husband, Joseph Shomo, with whom the contract was made, had no right to these slaves.   That when she signed the bills of sale, no question was asked as to her willingness to do so, and but through fear of her husband, she would have declared her unwillingness when complainant and his agent, Micajah Crupper, came to her house.

Joseph Shomo answers and states, that he made the

contract with complainant, Bobe, for the sale of the slaves, without the concurrence or consent of his wife, and that he apprised complainant at the time, he had no title to said slaves and told him they were the separate property of his wife, in consequence of which complainant bought them at about half their value. That the purchase money was paid to him, Joseph Shomo, and not to his wife, and was applied to his own private purposes, his wife not receiving or enjoying any portion of it. He admits that his wife signed the bills of sale reluctantly, but asserts that no fraud was practised or intended on complainant, who was advised of the nature of the title, and who in consideration of getting the slaves at half price, was willing to run the hazard of a recovery of them by the said Rosanna Shomo.

Maiben, the Trustee, in his answer, admits his appointment as Trustee, &c., and declares that the suit at law for the slaves, was brought at the request of Mrs. Rosanna Shomo, and in discharge of his duty as Trustee.

Micajah Crupper, a witness for complainant, testified that shortly after Joseph Shomo came to Pensacola with his family and negroes, he enquired of witness if he knew of any person who would be likely to purchase some of his slaves, and witness referred him to complainant. About the same time, he presented the conveyance made by David Tate to Rosanna Shomo to be recorded, supposing witness to be clerk. Witness handed the paper shortly after to the clerk, and he recorded it. Complainant asked me if I thought the title was good. He came to the office and examined the conveyance from Tate to Mrs. Shomo, and I gave it as my opinion that the title was in Mrs. Sho-

49

mo, and was good.  I advised complainant to  purchase.—
A few  days  afterwards complainant came to me and re-
quested me to draw up  a  bill of sale, which I did, and  at
his request, I  went  to  Mrs.  Shomo's in his company  to
get her to sign the bill of sale.   She signed it and  received
the money.   Afterwards at the instance  of complainant,  I
drew another bill of sale for  other slaves.   On our arrival
at Mrs. Shomo's, I presented the bill of sale to her  for  sig-
nature, and asked her if she knew what it  was.   She an-
swered  that  she  did, and that it  was unnecessary for me
to read it.   She signed it and received  the  money  in  the
presence of her husband and son, without objection.

    This witness further says, that he was Deputy  Clerk  of
Escambia  Circuit Court.   There was no  paper  presented
for record, except the deed from David Tate to  Mrs.  Sho-
mo.   He saw nothing in the deportment of Mrs. Shomo to
induced the belief that she  was coerced to sign the bills  of
sale.

    F. E. de LaRua, another witness for complainant,  testi-
fied that he was Clerk of the  Circut Court  when  the  deed
from Tate to Mrs. Shomo was recorded, and that no  other
paper was presented for record.   The deed from Tate was
handed to my deputy, Mr, Crupper, by Mr. Shomo.

    David  Shomo, a witness  for defendant, testified that he
was present when complainant paid for two negroes,  pur-
chased  from  J.  Shomo.   The money was counted by Mr.
Crupper  and myself, and was  paid to Joseph Shomo.  Mrs.
Shomo  was called out  of her private room to sign the bill
of sale, and after signing, retired to her room,  leaving  the
paper and the money on the table.   No question was  ask-
ed as to her willingness to sign the bill of sale.   She  sign-

ed it reluctantly and under the threats of her husband, that if she did not sign it, he would sell the whole of them.   In answer to the cross interogatories, this witness declares that he is a son of Joseph and Rosanna Shomo, and was at the time of the transaction spoken of, between twenty-four and twenty-five years of age ; that he knew of Richard Maiben being Trustee of his mother, and knew of no fraud intended to be practised on complainant.   His mother, Mrs. Shomo, was opposed to selling any of the negroes.   The threats spoken of, were not made in the presence of complainant, nor in his hearing.   He has heard of the sale of others of the same lot of negroes, but does not know to whom, when or by whom made.

. Joseph Shomo was examined as a witness for defendant, who declared that before the sales to complainant, and early in March, 1847, he presented the deed from Tate to Rosanna Shomo, and the record of the appointment of Maiben as Trustee, to Micajah Crupper, as Deputy Clerk, to be recorded.   When Mr. La Rua, the Clerk handed me the deed from Tate, he told me he could not record the transcript of the record referred to, because it was not the original, but a copy; and he was not authorized to record a copy.   He also states that Micajah Crupper, to whom he had communicated the fact, knew of the appointment of Maiben as Trustee.   He witness, made the sale to complainant and received the money, and not Mrs. Shomo.

The Court below perpetuated the injunction against the judgment obtained by Maiben the Trustee, from which an appeal was taken to this Court,

*D. Jordan*, for appellants.

*B. D. Wright*, for appellee.

BALTZELL, ·C. J., delivered the opinion of the Court.

On the 15th of November, 1829, David Tate gave by deed properly executed, to his sister, Rosanna Shomo, several negroes with the provision that they were "not to be subject to the control, or debts, or contracts of her husband," and to be solely invested as the property of his sister." Tate, his sister, and her husband, at this time and for a considerable period afterwards, resided in the State of Alabama. The two latter, husband and wife, removed to Pensacola in this State, where a sale was made by them to Bobe, on the 15th day of June, 1847, of negro Henry, for the sum of three hundred dollars, and afterwards on the 1st of January, 1848, of negro woman Jents and her child Flemming, for the consideration of six hundred dollars. Bills of sale were executed in the name of Mrs. Shomo and her husband united in ratifying and comfirming the sale so far as his interest was concerned. Before removal from Alabama, application was made to the Circuit Court of Baldwin County, for the appointment of Trustees, and two, William Waller and Richard Maiben, were appointed to take charge of the trust estate for Mrs. Shomo.— Maiben as surviving Trustee, instituted suit and recovered judgment in the Circuit Court at Pensacola, against Bobe the purchaser of these slaves, for the sum of sixteen hundred dollars, to be relieved from which, Bobe filed his bill in Chancery, and this gave rise to the present controversy.

The bill is inartificially drawn, leaving a good deal to inference, and deficient in many material allegations.—

The case, however, has been discussed on the merits, and we now proceed to consider it in that light, without regard to the objections that might otherwise be entitled to consideration.

There has been no question made as to the effect of the deed of gift nor has it been denied that a separate estate is created by it. The main question then arises as to the power of the *feme*, Mrs. Shomo, to dispose of the property.

Whatever difference of opinion there may be on the subject elsewhere, in Alabama where this deed was made and where all the parties resided at the time of its execution, there is no diversity. The language of the Court there is emphatic. "We think the authorities are clear that a woman having a separate estate may charge or sell or dispose of it at pleasure and without the consent or concurrence of her trustee and may make a will of it, if personal property, at her death, and that a Court of law to some extent, and a Court of Equity to the fullest extent will give validity to her acts. And where a deed, will or other instrument creating such separate estate imposes no restrictions or conditons on the power of alienation or absolute disposition, the law will impose none except such as it imposes on the *feme sole*. In the case of Bradford vs. Greenway 17 Ala. 197, this Court showed a leaning to the English doctrine. The question being now submitted for decision we shall hold the English and New York doctrine which gives to the wife, having a separate estate, the *jus disponendi*, unless the same is taken away or restricted by the deed creating the estate." Hoopers Ex. vs. Smith 23, Ala. 643.

There is in this deed of gift of Tate to Mrs. Shomo no restriction as to alienation, no direction of any kind as to the disposition of the property. This Court having held in the case of a contract made in a sister State, that the laws of that State as administered by her judicial tribunals must form the rule of its discision, this decision of the Supreme Court of Alabama, might well be regarded as conclusive as to this point. Watts vs. Clardy, 2 Fla. 369.

But we have been strongly urged to assert the South Carolina doctrine, as the governing one, to the effect "that a married woman connot part with her separate estate or change it in any way without an examination, and that the power of appointing such estate must be expressly given, and the mode prescribed, be strictly pursued." Ewing vs. Smith, 3 Dess. It is not perceived how the decrees of the Courts of South Carolina can be held to apply to a case in which there is no proof that the parties ever lived there, or had in view their laws in making the contract.

Without enquiring at present into the reason of the rule let us examine into the adoption of it. It was first started in the case of Ewing vs. Smith in 1811, 3, Dess. 417, by a divided Court, three to two, and amongst the dissentient Judges we find that distinguished jurist, Chancellor Dessaussure, and so the matter stood until 1826, when the Court of Appeals consisting of three law Judges and two Chancellors Dessaussure and Waddy Thompson, all agreeing held the following language. "How far a married woman may be considered as having the disposition of property settled on her for her separate use, is a question which *is not yet finally settled* in this State. The subject is so fully

considered in the able opinions in the case of Ewing vs Smith 3 Dess. 417, that we shall not have occasion to resor. to any other authority. It appears from the cases there collected to be the well settled doctrine in England that at *feme covert* has the exclusive right to dispose of such pro- perty as is settled to her separate use. From the time of Norton vs. Turvill 2 P. Wms., which was decided in 1723 up to the case of Ellis vs. Atkinson, 3 Bro. C. C. 565, decided by Ld. Thurlow in 1792, being a period of near seventy years, the whole current of doctrine is that way. There was a short period of about ten years from the resignation of Ld. Thur- low, until Lord Eldon came into office, during which time Lord Rosslyn and Lord Alvanly seemed disposed to ques- tion the correctness of these decisions. But Lord Eldon has since recognized their authority and there is now no principle better established in the English Courts." Sh. Frazier vs. Center &c. 1 McCord Cly 274.

In this condition the subject remained until 1846, when the case of Reed vs. Lamar announced the contrary doc- trine supported by other more recent cases. For the fif- teen years preceeding the case of Frazier, and twenty years succeeding the case of Ewing, decided by a devided Court, making a period of thirty five years, the question may be considered as unsettled in South Carolina, her Chan- cellors and Judges being greatly divided about it. Let us turn to the other American Courts; here we find Pennsylvania fa- voring this doctrine. Tennessee apparently adopting it in Mor- gan vs. Elam, though the case did not call for a decision on the point, 4 Yerger, 375, and the Judges did not unite in this view of it, afterwards asserting the very contrary in Powell vs. Powell. "In the absence of any restriction or

limitation of appointment, the rule in equity, on the subject is that a *feme covert*, acting with respect to her separate property, is competent to act in all respects as if she were a *feme sole*, 2 Vesy, Sr, 190, H.... vs. S...., 1 B. C. C., 192 Clancey on Hus. and Wife, 282, and this rule has been applied to all her dealings on the subject of that property;" 9 Hump., 480. Reliance is placed on Mississippi as favoring that view, yet we shall find her Courts asserting it on the faith of the Tennessee 'case of Morgan vs. Elam, and strange to say, a few months only, after that case had been, in effect, overruled, and after the Supreme Court of Mississippi had announced an adverse opinion in Frost, &c., vs. Doyle, through C. J. Sharky, that "the general rule at common law is that a *feme covert* having a separate estate, acts with regard to it as a *feme sole*," 7 Smeed and Marshall, 75.

From these conflicting, varying and discordant views, we turn to the American Courts asserting the right of the woman to dispose of her property where there is no restriction in the instrument; and, first, we have the case of Jacques vs. the Methodist Church, 17 Johnson, 548, decided by the New York Supreme Court, then in its prime, and commanding the confidence of the whole nation—a case elaborately argued, and of the decision of which the Supreme Court of Connecticut say, "we adopt the English rule, not only supported by the highest authority, but because we think it also supported by the strongest reasons. These are most clearly and forcibly stated by the distinguished Judges in Jacques vs. Methodist Church. We think they are unanswerable, and deem it necessary only, to refer to the views expressed in those opinions as expres-

sive of our own." Jenley vs. Huntington, 20 Connecticut 175.

The later New York Courts hold language fully as decided; "no doctrine is more fully and clearly established than that a *feme covert*, in regard to her separate estate, is considered in equity in all respects as a *feme sole*. The rule was first laid down by Lord Hardwick, in Peacock vs. Monk, 2 Vesey Sen., 190, and for a long time Courts of Equity seem to have hesitated as to its adoption, and were disposed to qualify and restrict its application. No traces however, of such hesitation or doubt are to be found in the more recent decisions, but on the contrary, they have carried out the rule in the fullest sense that its terms import; consequently it is now certain that when real or personal property is settled to the separate use of a married woman, her power of disposition or control is subject to no other limitations or restraint than such as the terms and the settlement plainly impose." Noyes vs. Blackman, 3 Sanf. 540, 17 John. 548; 1 Vesey Jr. 46. 7 Paige 9, 3 Bro. C. C. 8. 20 Wend. 570; 14 Vesey, 542. 7 Paige 112 3 M. & K. 220, 1 Sanf. 17, 287. 1 Cr. & Ph. 53. 1 Beav. 1.

In Virginia, Maryland, Ohio, Missouri, Vermont and the later decisions in Kentucky, we find the same views. West vs. West 3 Rand. 373. 2 Leigh 183, 5 B. M. 163, 10 14 Ib. 320; Missouri 760. 4 Vert. 336. 10 Ohio 216.— North Carolina is equally emphatic. " In this respect, real and personal property differ, for as to the latter the separate estate of the wife includes her *jus disponendi*, as held in Fettiplace vs. Gorges 1 VesyJr. 46. and 3 Bro. C. C. 8, in

which Lord Thurlow explicitly states the distinction between the two kinds of property; by saying that where the wife makes a voluntary disposition of an estate held to her separate use against the heir, it cannot be carried into execution, but with respect *to personal property, her gift is good.*" Ruffin C. J. Newbin vs. Freeman, 4 Iredell's Eq. 318. Georgia too is quoted in Hill on trustees 513 as favoring the doctrine. 12, Geo. 200.

In Alabama we have seen the adoption of the same view. 23 Ala. 643.

In New Jersey, after a very elaborate argument against the English doctrine, the Chancellor said, "in the midst of such conflict of opinions it is clear that we are left, in the determination of the question upon what may appear to be sound principles of equity. And I think it may be safely said that a *feme covert* is a *feme sole* as to her separate estate, so far as to dispose of it in any way not inconsistent with the terms of the instrument under which she holds. Any danger apprehended from such rule can be avoided by words restraining the disposition and directing the precise mode in which it may be made. 3 Green 551.

It is erroneously assumed, we think, that Chancellor Kent contended for the strict doctrine when discussing the Jacques and Methodist Church case. His main aim evidently in that case was against requiring strict terms forbidding or directing alienation. "But if the intention be equally clear and certain in the instrument in question, why should more explicit language be required?" At the close of his opinion in summing up the result of his examination of the cases he says, as to this, "Perhaps we

may say that if the instrument be silent as to the mode of exercising the power of appointment or disposition, it intended to leave it at large to the discretion and necessities of the wife, and this is the most that can be inferred." 3 Johns Ch. 114.

How very different is the language of that eminent Jurist Judge Story whose work on Equity Jurisprudence has become a text book to the American Lawyer. "There is *no doubt* that a gift of personal estate, or of the rent and profits of real estate to a married woman for her separate use during her life would give her a complete power to dispose of the same." 2 Story Eq. 828 30 § 1393.

Again "it may now be laid down as a general rule that all anti-nuptial agreements, for securing to a wife separate property, will, unless the contrary is stipulated or implied, give her in equity the full power of disposing of the same, whether real or personal, by any suitable act or instrument in her life time, or by last will in the same manner and to the same extent, as if she were a *feme sole*." 3 Story, Eq. 827 § 1391.

"When a married woman has a power to dispose of property, she may execute it in any manner capable of transferring it. When she has a power only over it she must dispose of it in the manner prescribed by the power." 2 Story, Eq. 828 § 1391.

The English text books use language no less decided. "It is settled that an express negative declaration is requisite to deprive a *feme covert* of her *prima facie* right of disposing of her separate estate. Hill on trust. by Wh. 422; 2 Rop. Hus. and Wife 236, 240; Brown vs. Bamfro, 11 Sim. 131 ; 2 Chitty Black. 293; n. 12.

Nor do we apprehend there is the difficulty about the English cases which is assumed to exist as to the point under consideration.   When the case of Wagstaff vs. Smith was argued, not long after the decision of the disputed cases of Pyles vs. Smith, Whistler vs. Newman, Hulme vs. Tenant, Peacock vs Monk, &c., the Master of the Rolls expressed himself as follows : "The only question appears to me to be whether this lady has an absolute complete life interest in the dividends to her separate use. If she has, then unless the former doctrine of this Court, that as to separate property, a married woman is to be considered a *feme sole,* is abrogated by later determinations, she had a right to make any disposition she thought fit of that separate property.    There is no case in which that doctrine has been impeached, that is, the broad rule that a married woman is to be considered a *feme sole* as to property to her separate use.   There are many cases in which the question has been whether the absolute property, including a power of disposition, was intended to be given, or whether it was a personal gift only, without a power of disposition," &c. &c. This is very different, here are no words of control, no words of restriction.    Here are the very words to give the absolute property.   "The settlement was to trustees to permit the *feme* to take and receive the dividends of £750, to her own use during life, independent of her husband, &c., and she assigned to a third party."   9 Vesey 520.

"Executed trusts" says Ch. Kent, "are enjoyed in the same condition and entitled to the same benefits of ownership, and are consequently disposible and devisable, exactly as if they were legal estates and there rights the

*tcseui que trust* possesses without the intervention of the trustee." 4 Kent. 302.

A trust is executed either when the legal estate passes-as in a conveyance to B. in trust, or for the use of C. or when only the equitable title passes, as in case of a conveyance to B. to the use of C. in trust for D. The trust in this last case is executed in D. though he has not the legal estate. 4 Kent. 305.

Such is the relative position of this subject in the English and American Courts, and as treated by Judges, jurists and writers of the two Countries.

Were we free to adopt the strict rule with such slight authority in its favor, we are yet constrained to say that it has not our sanction on the score of principle or analogy of propriety or fitness. It restricts the alienation of property. Such restrictions have been condemned from the very earliest ages of the law; they were held by Lord Coke to be absurd and repugnant to the freedom and liberty of freemen. Chancellor Kent says that " the maxim which he Lord Coke cites, contains a just and enlightened principle worthy of the spirit of the English law, in the best ages of English freedom. *Iniquum est ingenuis hominibus non esse liberam rerum suarum alienationem.* 4 Kent 131.

Perpetuity, the condition of an estate being rendered perpetual or for any period of time inalienable by the act of proprietors. Holthouse Law Dict., 335.

" A perpetuity is a thing odious in law, and destructive to the commonwealth. It would put a stop to commerce and prevent the circulation of the property of the kingdom." Vernon, 164. " A perpetuity is defined to be where though all who have an interest should join in a convey-

ance, yet they could not bar or pass the estate. 5 Jacob Law Dic., 142.

"Experience says Sir Wm. Blackstone, hath shown that property best answers the purposes of civil life, especially in commercial countries, when its transfer and circulation are totally free and unrestrained." An elegant writer speaks on the subject as follows: "The necessity of im-posing some restraint on the power of protracting the acquisition of the absolute interest or dominion over property, will be obvious, if we consider for a moment what would be the state of a community in which a considerable proportion of the land and capital was blocked up. That free and active circulation of property, which is one of the springs as well as the consequences of property, would be obstructed, the improvement of land checked, its acquisition rendered difficult, the capital of the country gradually withdrawn from trade, and the incentives to exertion in every branch of industry diminished. Indeed such a state of things would be utterly inconsistent with national prosperity, and these restrictions which were intended by the donors to guard the objects of their bounty against the effects of their own improvidence, or originated in more exceptionable motives would be baneful to all." 1 Jarman on Wills, 219–20.

The most of the State Constitutions seem to have reference to this subject, by declaring "that perpetuities and monopolies are contrary to the genius of a free State, and ought not to be allowed." Florida Constitution, Article second, Section twenty-fourth. Indeed one of the fruits of our glorious revolution was connected in some degree in the public regard with this question, of unfettering of es-

tates.  Our Legislature seems to have provided against this danger, by declaring in the law to secure the rights of married women, "that husband and wife shall join in all sales, transfers, and conveyances of the property of the wife, and the real estate shall only be conveyed by deed attested."  Thomp. Dig., 221 .

According to the strict doctrine, neither the trustee, the married woman, nor her husband, nor altogether, can alien or dispose of the property, thereby creating a perpetuity within the strict definition of the term ; nor can it be sold, except by the permission of a Court of Chancery. As a fair consequence, Courts of Equity may be considered as the owners as far as alienation is concerned, to protect against bad bargains, in case of necessity to make good ones for them.  Now admitting this to be a rightful exercise of judicial power, which is by no means conceded, the enquiry arises, why not go further and protect them as to a disposition of the income, and the disbursement of the receipts and profits of the separate estate, far more important than its mere possession or ownership.

But again, this restriction upon the rights of married women implies a distrust not by any means flattering to them or to the other sex.  Are those of our state less to be trusted or confided in, in this respect than the women of England or New York, and other states of the Union where freedom of alienation prevails ; are they more imbecile ? have they less character, less self reliance and ability to assert their rights, or have those of the other sex greater disposition to impose upon, oppress and take advantage of their weakness and infirmities ?  We think not.  If they are unfit to be trusted with powers of alienation, their

right of ownership may well be doubted. Their sound judgment, good sense and intelligence, their virtue and native energy, with the gallantry and sense of justice of the other sex are their surest and safest reliance. The world has an experience in its past history, not to be forgotten, of the effects of special guardianships of this kind. This experience has demonstrated that to hedge their pro-perty with restrictions and guards is as impotent and use-less as to surround their persons by stone walls to pre-vent injury and insult. We have then the experience of the English Courts for upwards of a century, and of the first and best minds of that country, jurists, judges and commentators, in favor of giving this right to married wo-men, and against the restriction. In a late work of merit we have this tribute to the law as thus administered, "On surveying the temple of English jurisprudence we behold in it a range of columns which while they impart symme-try and beauty to the whole building, afford it also materi-al support. "The laws of property are nicely adapted for preserving harmony between the diversified elements which constitute the sources of national prosperity, at a point where they are most liable to clash, by securing the necessary freedom of commerce in the alienation and pledge of every species of property on the one hand, and the proper and reasonable regard to private and family pur-poses, in the settlement of property on the other." Lewis on perpetuity 4.

We have in addition to this the vast prepondrance of the American Courts, jurists, judges and writers in its favor, we have the provisions of our own law, fortified by our own views of the fitness and propriety of the thing. Can we

then hesitate as to its adoption ?    In doing this we are by no means to be considered as adopting the rule to the full extent to which it has been carried by the English Courts. We have purposely avoided the discussion of other questions, having an apparent connection with the one under considertion, desiring to confine our decision to the simple point presented as to right of alienation, where there is no restriction or direction in the instrument creating the separate estate.    One other remark in connection with the case; it will be seen that as alienation is not permitted by the trustee according to the Carolina rule, a suit at law to recover damages as a substitute for the property, affirming, as a consequence, its sale at the option of the trustee is also inadmissible.    But aside from this, what disposition, is to be made of the money when obtained by the judgement ?    Is this to be paid to the *feme?*    If paid to her, has she power over it and to what extent?    If paid to the trustee, how is he to dispose of it?

Mrs. Shomo charges that the sale was made through the improper influence and coercion of her husband; undoubtedly, if this is the case, the Court without hesitancy would refuse the plaintiff the relief asked, and the Court would scrutinize, very carefully and cautiously, the act to ascertain that it is not liable to that objection.

She charges that " her husband informed her, unless she signed the bills of sale he would run all the negroes to New Orleans and sell them, for he had the advantage of her and would use it and do just as he pleased.    She was well convinced he would do so and she would never know where they were.    As she was thus compelled to sign the bills of sale or have all her negroes run off, she thought if she

51

signed in Pensacola she could afterwards recover them by law in our courts." She states further that "a short time previous to the sale of these negroes her husband took a valuable female slave of hers in open defiance of her, and placed her on board of a vessel to be shipped to New Orleans for sale when a freind of hers, Mrs. Welborne interposed in her behalf and prevailed on her husband to bring her back." ·

The testimony shows that other negroes of hers were mortgaged to Moreno and sold to Caldwell and Jemison. She complains that a fraud was perpetrated upon her rights by her husband and said Bobe; knowing that her husband had no right to these slaves, he Bobe unjustly forbore to ask her if she was willing to sell them, had he done so she would have told him that she was not willing to sell them, and but for her husband's threats she would have declared her unwillingness when Complt. and his agent came to her house." Her account of her signing the bills is as follows: "He informed her that on a certain day Bobe would come to the house with others, to have the bill singed. When he came with the bill of sale for Jints, one Mr. Crupper came along. This respondent was called out of her private room by her husband into the presence of these gentlemen, Crupper drew out of his hat or pocket a paper and asked if she would read it, she knowing what they had come for said he need not, it was then handed to her and she signed it. No questions were asked her if she was willing to sign. The money was paid to or received by her husband, and she withdrew."

It no where appears by the testimony of either Shomo or his son, nor by any allegation of Mrs. Shomo that Bobe

had any information or knowledge of this unwillingness or coercion, so that there is no reason nor cause for the allegation of fraud as to him, on the contrary he appears to us as a purchaser for a valuable consideration without notice as to this objection.

There is neither justification nor excuse in our opinion for the conduct of Mrs. Shomo in this matter. That she feared wrong or injury from her husband is no reason why a stranger should be wronged. The apprehension of loss of property by her does not justify her in transferring the loss to him, nor does there seem to have been a necessity for such action, as by her own statement, a friend interfered on a prior occasion; why not resort to this expedient when a necessity existed for it at another time. But she seems to have relied upon the Courts in support of her rights; why not appeal to them in the first instance in time to arrest the danger? Why wait until an innocent party had bought and paid his money for the property, to commence upon him and try the experiment of getting a double price for herself and family. If this and other purchases are to be disturbed, a handsome speculation will be made by her silence, and the confidence reposed in her and her family, to enure to their joint benefit. There is another fact to be borne in mind altogether inconsistent with fair dealing, and with this idea of coercion. One of these negroes was sold in June 1847, the other in January 1848, and during this time Mrs. Shomo admits she traded at the store of Bobe; now why not inform him of the fact of this constraint and coercion, and admonish him not to buy again? Married women are entitled to the peculiar regard of Courts of Equity, but it is when they present a case

of fairness and of equity, free from unfair dealing and impropriety. We are rather inclined to the opinion that the defence of this party, Bobe, might have availed him at law. Such we understand to be the decision in 3 Hill 249, Ford vs. Caldwell. We have not this case before us and do not decide the point, nor is it necessary as already intimated the case has been presented on the merits without objection on such grounds.

The decree of the Court below will be affirmed with costs.

DuPONT, J., delivered the following

### DISSENTING OPINION.

I am constrained to dissent as well from the view which the majority of the Court have taken of the law and the facts of this case, as from the judgment which has been rendered therein. The main point which has been so elaborately discussed in the opinion delivered by the Chief Justice, is not a new one. It engaged the attention of the English Court of Chancery at an early day; and there is no subject, perhaps, in the entire range of English jurisprudence which has been productive of more perplexing anxiety or painful solicitude. The very frequency of its occurrence in the English Courts, conclusively demonstrates the fact, that the judicial mind of that country has failed thus far, to find a satisfactory foundation upon which to rest, and I have the authority of Chancellor Kent for saying, "that the English decisions, (on this subject,) are so floating and contradictory, as to leave us the liberty of adopting the true principle of these settlements." In this estimate of the English decisions, Chancellor Harper also concurs. In the case of Reid vs. Lamar, (1 Strob. Eq. R.,

39,) he took accasion to remark as follows : "I need not do that which has been done before by abler men, compare and collate the cases, (though I have examined many of them,) with a view to show that they are uncertain and contradictory between themselves, many of them referable to no fixed principle, and a source of embarrassment and regret to the ablest Judges who have administered the English Chancery law."

In the face of the scrutinizing examination which these two lights of American Ch. Ju., have given to the decisions of the English Courts, it would seem to be a work of supererogation, if not vanity, to attempt to tread the devious windings of that massy labyrinth, whence they have so recently emerged, with any expectation or even hope, of being able to make any further contribution to the cause of legal science. We may well be satisfied with the fidelity of their efforts, and content ourselves with the. fruit of their researches.

Notwithstanding, however, the fluctuation of the Enlish cases with respect to this subject, it must be admitted that the *current* of the decisions tends pretty conclusively to the establishment of the position, "that a *feme covert* acting with respect to her seperate property, is competent to act in all respects, as if she were a *feme sole*." This is the doctrine announced in the case of Peacok vs. Monk, (2 Vesey, 190,) and again approved and acted upon by Lord Thurlow in the case of Hulme vs. Tenant, (1 Bro. C. C., 16.)

This doctrine, as thus broadly laid down, has been a fruitful source of embarrassment to the English Chancellors, so much so indeed, as to have caused Lord Thurlow upon one occasion to declare, that in enforcing the doctrine, he acted

upon the authority of the prior cases, and directly against his own inclination and judgment. He further remarked "that if the point were open, he should have thought that a *feme covert*, who had a separate estate, should not part with it, without a judicial examination," and Lord Eldon himself, did not hesitate to expose the injustice and unreasonableness of the doctrine, and is made to declare in Sperling vs. Rockfort, (1 Vesey, 164,) that although he could not reconcile all that was said by Lord Roslyn, in Whisler vs. Newman, to former cases, yet he wished that the law might turn out for the protection of married women, to the extent to which it is there represented. Lord Alvanly, (as master of the Rolls,) in the case of Sackett and Wife vs. Wray, (4 Bro. C. C., 483,) held that in reference to the separate propery, the wife had no disposing power, but what was given her by the deed of settlement, and he meant to question the decision in Newman vs. Cartony, and Hulme vs. Tenant, Ellis vs. Atkinson, and Pybus vs. Smith.

Lord Roslyn was also strongly opposed to the doctrine, and upon several occasions manifested his entire dissent from the extreme length to which it had been carried in some of the decided cases. In the case of Whisler vs. Newman, (4 Vesey, 129,) he expose its utter nakedness by remarking, that the doctrine in Hulme vs. Tenant, took away all protection from married women, and made trusts for their benefit of very little importance. That if this rule in that case, and in Pybus vs. Smith, and Ellis vs. Atkinson, was to be pushed to its full extent, a married woman having trustees and her property under the administration of Chancery, was infinitely worse off and more unpro-

tected than she would be if left to her legal rights, which
the husband cannot *proprio mariti* affect.    And even in the
case of Hulme vs. Tenant, which is a leading case for the
support of the doctrine, Lord Bathurst at first dismissed the
bill, but it was afterwards sustained by Lord Thurlow upon
a rehearing.

In the midst of this fluctuation of decisions, discrepancy
of opinions, and expressions of regret, it certainly could
not have been deemed either rash or presumtuous in us, had
we elected to discard in a measure, the authority of En-
glish *precedent*, and invoked the surer guide of sound rea-
son, common sense and common justice.    And this election
we might the more readily have made, in consideration of
the fact, that this case presents for the first time in the
judicial history of our State, a suitable opportunity to ad-
judicate authoritatively, the point now under consideration,
and we were consequently, in a measure relieved from the
pressure of " *stare decisis*," at least to the extent of our
own adjudications.

Again, we ought to have been admonished by the painful
embarrassments which are constantly experienced by the
English Chancery, in the application of the doctrine as it
seems to have obtained there, of the importance, in setting
out upon our judicial career as a State, of placing the law
upon the immutable basis of *correct principle*.

But had we no other apology for this seeming disregard
of *precedent*, the delicate relation which as men we bear
to the very interesting class of society, who are more par-
ticularly interested in the question, ought to afford a suffi-
cient motive.    It would be monstrous indeed, that when
upon every other subject that affects the interests of men,

the law is continually changing to meet the progress of advancing civilization, upon this the most interesting of all subjects, and in reference too to a class of society who have kept even pace with the utmost progress of the age, it should be decreed to be as fixed and unalterable as is "the law of the Medes and Persians." Without intending to question the gallantry of the old English Chancellors, I may venture to assert that the sentiment that " it was against common right that the wife should have a separate property from her husband, *and therefore all reasonable intendments were to be admitted against her,*" would scarcely find a response at the present day ; and yet such is the reported language of Lord Macclesfield, in 2. P. W. 82., and Lord Talbot seems to have been eqally exacting with reference to the ladies of his day, for in one of the cases decided by him, (3 P. W. 355,) he is made to declare " that though the husband settles an annuity in trust for his wife's separate use, yet if he provide her with *clothes and other necessaries* it will for the time be a bar to any demand for arrears.'' Chancellor Kent, with his probing scrutiny, seems to have penetrated the true secret of this doctrine as it obtained in the English Courts, and intimates quite strongly that it might have originated and found its sanction *in the spirit of the age.* He remarks, (3 John: Ch. R. 92) " Such strong aversion to the wife's independent enjoyment of her separate estate, manifested so early in the history of the cases, may have given a permanent tone and color to the doctrine of the Court ; and perhaps the language of these cases will not now be thought to be founded in equity and justice."

The fundamental error of the reasoning upon which the English doctrine is based, consists in the assumption that

the settlement to the use of the *feme covert*, carries with it all the incidents of absolute ownership, of which the *jus disponendi* is the most prominent. Vide Fettiplace vs. Gorges—1 Vesy, Jr., 46. This assumption with respect to ownership, is clearly without any good foundation, when sought to be applied to the rights, powers and capacities of married women; for being purely a doctrine of the common law, it can by no principle of sound logic be made to bear upon a class, who by the canons of that very system are placed under disabilities as to ownership. Again, where there are trustees appointed to protect the trusts, it is very clear that the *legal* title to the property resides in the trustee, and in no one else; how then can the *cestui que trust* assume to convey that legal title, when she has only an equitable interest. And yet to sustain the *principle* of the English cases, it would seem that she must have the capacity to convey the legal title, for this is one of the "incidents of ownership." Now, in the case supposed, viz: where there is the intervention of a trustee, can she convey the legal title—can she convey that which she does not possess? And yet without the conveyance of the legal title, there is no full exercise of the *jus disponendi*, and consequently the reasoning must fail upon every principle of sound logic. But to demonstrate more conclusively the fallacy of this doctrine when tested by a practical illustration, let us suppose the *feme covert* (being by the terms of the deed of settlement a *cestui que trust*) exercises to the full extent her *jus disponendi*, what interest has the purchaser obtained? Evidently only such as resided in her at the time of the sale, viz: an equitable interest, and the legal title remains undisturbed. But a *complete* title must

52

embrace both the legal and equitable interest; and yet such a defective disposition as this, is assumed to be the practical enjoyment of one of the principle *incidents* of property. If any further argument were necessary to establish the fallacy and utter unsoundness of the position, I think it may be found in the painful embarrassments that have constantly met the English Chancery Courts at every step that they have taken to give it a practical application. It may be truly said that the practical application of this doctrine has been made amidst the wailings and lamentations of the English Chancellors, from the time of Lord Thurlow to the present day.

The foregoing reasoning is equally applicable to the case where there is, by the terms of the deed, no intervention of a trustee, but the property is made to vest wholly and directly in the *feme covert* for her separate use. For even those Courts which have most strenuously sustained the English doctrine, all (with a solitary exception so far as I am advised) admit that the appointment of a trustee is not indispensable to sustain the trusts for the separate use of the wife, but that where the appointment has been omitted in the deed of settlement, the husband will be converted into a trustee, *pro hac vice.* Bennett vs. Davis, 2 P. W. 316; Parker vs. Brook, 9 Vesy 583; Rich vs. Cockell, 9 Vesy 369; 2 Story's Eq. Ju., §1380.

Lord Brougham in Murry vs. Barlee (3 My. and K. 209) observes as follows: "That at law, a *feme covert* cannot in any way be sued even for necessaries, is certain. Bind herself or her husband by specialty, she cannot; and al. though living with him and not allowed necessaries, or apart from him, whether on an insufficient allowance or

an unpaid allowance, she may so bind him that those who furnish her with subsistence may sue him, yet even in respect of these, she herself is free from all suit. This is her position of disability or immunity at law, and this is now clearly settled. Her separate existence is not contemplated—it is merged by the coverture in that of the husband, and she is no more recognized than is the *cestui que trust*, or the mortgagor; the legal estate which is the only interest the law recognizes, being in others. But in equity, the case is wholly different. Her separate existence both as it regards her liabilities and her rights, is here abundantly acknowledged—not indeed that her person can be made liable, but her property may." His Lordship goes on further to say: "In all these cases I take the foundation of the doctrine to be this: the wife has a separate estate, subject to her own control, and exempt from all other interference or authority. If she cannot affect it no one can, and the very object of the settlement which vests it in her exclusively, is to enable her to deal with it as if she were *discovert*."

With the utmost respect for, and deference to the opinion of this eminent jurist, I cannot but think that he has fallen into two very manifest errors in regard to this subject. It certainly cannot be insisted with any show of truth, that the "object" of these settlements to the separate use of the wife, is to give her the uncontrolled disposal of the subject matter of the settlement. I should rather incline to the opinion, that the real object is such as is generally expressed on the face of the settlement, viz: the enjoyment of the use. But this certainly does not imply the right to part with or dispose of the property so settled. The en-

joyment of the *use* may clearly exist without the right of disposal. His Lordship seems to base his argument upon the further assumption, that because these settlements are the creatures exclusively of equity, therefore the common law disabilities of the wife are removed, and that she is restored to all the powers and capacities of a *feme sole ;* but I confess that I am unable to perceive the legitimacy of the deduction.

Upon every principle of sound logic, enlightened policy and strict justice, I am of the opinion that in the converse of the position assumed by the majority of the English cases, (which position has been adopted by the majority of this Court in the present case,) is to be found the correct doctrine in regard to this subject. While they assume that a married woman in respect to her separate estate is to be regarded as a *feme sole*, with the absolute dominion or power of disposal over it, except in so far as that power may be restrained by the terms of the deed or will under which she became entitled to *it, I* hold that she has no power to sell or dispose of her separate estate, but what is specially given to her by the very terms of the instrument under which she claims.

In arriving at this conclusion I feel that I but consult the true interests of her who occupies in society a position no less interesting than responsible—the wife and mother. So far from curtailing her rights, I desire but to add to them, by shielding her from the improvidence and not unfrequently the brutality of the sterner sex. By the adoption of this rule, we would give to marriage settlements their true character, and make them what they were intended to be—a protection against the undue influence of the hus-

band, and a sure guaranty for the comfortable maintenance of the wife.

It is insisted, however, by the majority of the Court, that our recent legislation in regard to the property of married women indicates very clearly the tendency of the legislative mind in favor of the adoption of the English doctrine. That the effect and tendency of the act usually denominated the "Married Woman's Law," is to free the property of the wife from the shackels which had been thrown around it by the canons of the common law, by giving her the right, with the concurrence of her husband, to dispose of it absolutely; and that this is demanded by the commercial spirit of the age.

With all proper respect for the superior intelligence of my associates, I am constrained to differ from them, both as regards the indications of the legislative mind and the practical effect of the act itself. It does not admit of a doubt, that the prime object of that act was to secure to the wife the title to her personal property. At common law, the personal estate of the wife, vested absolutely in the husband, and became subject to his control and disposal; and the statute was necessary to obviate and prevent that result, and to secure the legal title and the enjoyment of the property to the wife. This was the whole object and intention of the legislature in making that enactment. Nor is the practical effect of the statute such as the majority of the Court seem to suppose it to be. So far from relieving the disposal of the property from embarrassment, it but adds to that embarrassment, by requiring the *concurrence of two minds,* where only one was before necessary. For as by the common law, the personal estate of the wife

vested absolutely in the husband *jure mariti*, he might therefore dispose of it at his mere will and pleasure, independent of her wishes; but now by the statute, the title to the property being secured to the wife, the statute provides that no disposition shall be made of it, but by the *joint act and concurrence of the two.*

If it be the intention of the Court to apply the argument to property situated as this is, viz : property settled by *deed or will to the separate use of the wife*, I will only remark, that it is by no means clear that the provisions of the act were intended to reach that class of estates. The stipulations of the trusts contained in the settlement would certainly prevail, independent of the provisions of the statute. Indeed, if any deductions applicable to this discussion are to be drawn from the *spirit* of the act, it seems to me that I am strongly sustained in the view which I have taken of the law on this subject. It is admitted by all of the English Chancellors who have discussed this subject that the doctrine which I advocate, affords the more ample *protection* to the rights of the wife, and the statute certainly gives her rights, which she did not possess at common law, by *protecting* her personal property against the marital rights of the husband.

It may with some show of plausibility be replied, that the benificent arm of Equity is ever prompt to protect the weaker from the improper influences of the stronger; but there are many considerations why a resort to this source of protection, should be avoided, if possible. In the first place, the very act of applying to a Court of Equity for the redress of her grievances, is well calculated to engender discord and strife in the domestic circle, which not un-

frequently result in the entire disruption of the connubial tie. But even should resort be had to the protection of the Court, how and by what means shall the unfortunate wife, establish her allegations of the exercise of undue influence on the part of the husband? What witness is to be found sufficiently acquainted with the private relations of the parties, to be able to drag from its secret recesses the required evidence?

The case of Grigsby vs. Cox (1 Vesey 517) furnishes a strong and melancholy illustration of the views which I am now endeavoring to enforce, and should admonish us of the danger of adopting the doctrine of the English cases; which allows the wife, the full dominion over her separate estate. In that case there was a marriage settlement of an estate, in trust for the wife, to receive the rents and profits for her separate use, and as she should direct and appoint. There was no form of appointment mentioned. She by deed of appointment sold a part of the estate, without consulting her trustee, and with the concurrence of her husband. The answer of the wife in that case (*vide Belt's Supplement* 218) averred that she had executed the deeds, under the *threats and compulsion* of the husband; but the answer was unsupported by proof, and Lord Hardwicke held the purchase to be valid, and the consent of the trustees not necessary.

But it is not alone against the brutal threats of an unfeeling husband, that the wife is to be protected. The danger more frequently arises from the love, affection and mutual confidence, which ought always to characterize that delicate relation. To her who has been willing to abandon the cherished home of her childhood, the loved scenes

of joyous youth, the sacred associations of friends and relations, the warm embraces of father and mother, to cleave to the object of her heart's devotion, the sacrifice of property, interposes but a feeble barrier to a compliance with his behests; and thus the holiest impulses of her generous and confiding heart, are often converted into the deadliest foe to her domestic peace. In obedience to these generous impulses, she consents to strip herself of the comfortable support, provided by the provident solicitude of an affectionate parent, and is thrown with the pledges of connubial love, a hopeless pensioner upon the cold charity of the world. Doomed to a life of penury and want, she lingers out a miserable existence, which is to terminate only in crushed pride and blasted hopes! It is against consequences like these that I would interpose the barrier of the law; and I think that the object can be attained, only by leaving the power and capacity of the married woman, in respect to her separate estate, precisely where the common law in its wise benificence has placed it, *inability to bind herself by contract.*

Nor am I without authority of the very highest character to sanction the view which I have felt myself constrained to take in regard to this very interesting subject. Such has been the established doctrine, from an early date, in two of the oldest and most respectable States of the ~~Confederacy~~ Union; South Carolina and Pennsylvania, and such too is the current of decisions in Tennessee and Mississippi. Indeed, it is asserted, by Chancellor Kent (vide 2 Kent's Com. 165, note a) that this may now be considered as the sound and prevalent *American* doctrine, and contra-distinguished from that of the English

Courts; and in this assertion he is sustained by the very able Editors of White & Tudor's Leading cases in Equity. *Vide* Vol. 1 p. 405. This doctrine was first authoritatively announced to be the law in South Carolina, in the case of Ewing vs. Smith, (3 Dess. Eq. R. 417) and it has been strictly followed ever since, in that State. Chancellor Harper.in allusion to that case (*vide* Reid. vs. Lamar 1 Strobh. Eq. R. 37) says: "If any thing can be considered as settled, it is the settled law of this state, that when property is given or settled to the separate use of a married woman, she has no power to charge, encumber or dispose of it, unless in so far as power to do so has been conferred on her by the instrument creating her estate, which power must be strictly pursued, in contradistinction to many English cases, in which it has been held that she is a *feme sole* with respect to her separate property, and may charge and dispose of it as she pleases, unless in so far as she is expressly restricted by the instrument. This has been the settled law since the decision in Ewing vs. Smith, followed by a great number of cases decided in conformity to it, for a period of more than thirty years, and without any decision impugning or conflicing with it."

In the case of Lyne's Executor vs. Crouse et. al. (1 Barr R. 114) decided by the Supreme Court of Pennsylvania, the Court remarked as follows: " In Lancaster vs. Dolan, 1 Rawle, it is laid down as the rule, that a married woman has no power but what is expressly given. In the case of Thomas vs. Folwell 2 Wharton, this rule is recognized as the settled law in Pennsylvania: That a married woman is to be deemed to possess no power in respect to her separate estate, but what is positively given or re-

53

served for her by the instrument creating such estate. Several other decisions of a later date recognise this doctrine. So, that whatever may be the law in other states, or in England, we must take the rule here indicated with so much conformity, as the law of this State; besides, this rule has the merit of substantial justice to support it."

This doctrine has been very elaborately discussed in the Supreme Court of the State of Tennessee and with the same result. In the case of Morgan vs. Elam, (4 Yerger R., 434,) Whyte, J., remarked in deliving his opinion: "I must confess that after the best examination that my very slender abilities permit, if it were necessary by the facts of the present case, to express an opinion decisively on this much controverted subject, I at present would say, that upon the principles upon which the doctrine is professed to be founded, and even upon the principle assigned in the cases, favoring the enlarged powers of the *feme covert,* as the ground of such determination, according to my understanding of them, but above all, from the very moving cause and design of a settlement upon a *femme covert,* her restricted powers as laid down in the settlement itself, ought, according to the plain intent therein and thereby expressed, to give the rule, and measure its extent; rejecting the subtleties of wiredrawn though able disquisition, and the entanglement of disputation, enquiry and investigation."

Green J., in his opinion delivered in the same case, remarks: "I regard this question as being unsettled in this country, and this Court is under no obligation from a concurrent course of legal adjudication, to sacrific principle to

precedent." In allusion to the argument used by Judge Platt, in his opinion in the case of Jacques vs. the Methodists Episcopal Church, (17 John. R., 548,) to the effect, that it is for the interest of society that the common law rule, that the husband becomes owner of all the wife's personal estate should prevail, and that therefore, it is best that such rule of construction should be adopted, as will enable the husband by the consent of his wife, to possess himself of her estate, His Honor denounced it in the strongest and most indignant language. "This argument," (says he,) "is as defective in morals, as it is in sound legal principle. It defeats the prudent foresight of the settler, by enabling the husband and the wife to make a disposition of the estate, which the deed was specially intended to prevent; and at the same time it holds out an inducement of the strongest character for the husband to use undue means to obtain for himself his wife's estate." In commenting upon the various influences which may be brought to bear upon the wife, he exhibits the dangerous character of the English doctrine, in language as beautiful and chaste as it is just and true. "Surely, he remarks, a just regard for the morals of society and an honest fulfillment of the intention of the grantor, alike demand that the powers of a married woman over her separate estate, shall not extend beyond the plain meaning of the deed creating the estate." The result of his investigations in regard to this subject, is couched in the following language: "As by the common law rule, the existence of the wife is suspended during coverture, and she is rendered incapable of making any contract, it would seem to follow that when separate rights and distinct powers are conferred on her by a deed of mar-

riage settlement, that such deed should be so construed as to give her none of the powers of a *feme sole*, other than those expressly conferred by it." Catron, C. J., also concurred with Whyte and Green, remarking, " what the English doctrine is on the subject, it is diffiult to ascertain. The decisions are so confused and repugnant, that Lord Eldon's complaint in Sperling vs. Rochfort, is most true, that upon all the cases taken together, it is utterly impossible to know the result."

The doctrine as thus announced, was emphatically approved in the subsequent case of Litton vs. Baldwin. (8 Humph. R., 209.)

But it is asserted by the C. J. in the opinion delivered in this case, that the case of Morgan vs. Elam and Litton vs. Baldwin, have been overruled by the subsequent case of Powell vs. Powell, (9 Humph. R. 477,) and that the English doctrine now prevails in the State of Tennessee. This, in my opinion, is mere assumption. It is only necessary to refer to the case of Powell vs. Powell to perceive that the question now under discussion did not arise, even incidentally; and the loose remarks of Turley J. in approbation of the English doctrine, must be considered in the light of mere *dicta*, and by no means entitled to the importance sought to be given to them. He does not refer, or even allude to either of these cases, but bases his remarks exclusively upon the doctrine as announced in Peacock vs. Monk and Hulme vs. Tenant. The fact is, that His Honor seems to have been either ignorant of, or had forgotten the fact, that the point had ever been decided by the Supreme Court of his State. His remarks were evidently the result of *inadvertence*. It would indeed be a

case unheard of, that so important a doctrine should be deemed to have been overruled, when the cases establishing it were not even alluded to. The only questions arising in the case of Powell vs. Powell, and the only ones which the Court pretended to decide were, whether a direct conveyance from husband to wife, made upon a valuable consideration, would be sustained in equity, and whether the relinquishment by the wife of her *right of dower* in real estate, amounted to such a valuable consideration. Both of these questions were decided in the affirmative, and that is the entire sum and substance of that case. I hazard nothing in asserting that the doctrine contained in the case of Morgan vs. Elam, has been the settled law of the State of Tennessee from the date of that case to the present time.

The same doctrine was held in the Supreme Court of the State of Mississippi in the case of Doty et al vs. Mitchell, (9 S. and M. 435,) and referred to and affirmed in the subsequent case of Montgomery vs. the Agricultural Bank (10 S. and M. 566).

Whether any of the other States of the Confederacy have adopted this view of the law, I have been unable to ascertain, not having had sufficient access to the reports of their decisions to be able to determine.

I do not feel that I should be justified in dismissing this subject without a more special reference to the very able and lucid opinion of Chancellor Kent, delivered in the case of the M. E. Church vs. Jacques. It is true that this case was overruled on appeal to the Court of Errors of New York; and while it can be of no *authority* in that State, yet it will not fail to commend itself to our most respectful

consideration, as well from the high character of its author, as from the critical analysis, the broad and expansive views, and the logical argument with which the opinion itself abounds. As a contribution to legal science, it may well rank amongst its proudest trophies. The opinions of such a man are surely entitled to the utmost consideration, and I may therefore be pardoned for citing, somewhat at length, his remarks with respect to the result of his investigations into this very interesting question : " I apprehend," says he, " we may conclude (though I certainly do it with unfeigned diffidence, considering how great talents and learning, by a succession of distinguished men, have been exhausted upon the subject,) that the English decisions are so floating and contradictory as to leave us the liberty of adopting the true principle of these settlements. Instead of holding that the wife is a *feme sole* to all intents and purposes as to her separate property, she ought only to be deemed a *feme sole sub modo*, or to the extent of the power clearly given by the settlement. Instead of maintaining that she has an absolute power of disposition unless specially restrained by the instrument, the converse of the proposition would be more correct, that she has no power but what is specially given, and to be exercised only in the mode prescribed, if any such there be. Her incapacity is general, and the exception is to be taken strictly and to be shown in every case, because it is against the general policy and immemorial doctrine of law. These very settlements are intended to protect her weakness against her husband's power, and her maintenance against his dissipation. It is a protection which the Court allows her to

assume, and her friends to give, and it ought not to be rendered illusory."

Applying the doctrine to be extracted from the foregoing views to this case, and I am at a loss to conceive upon what principle the decree of the Court below can be sustained. It is true that in most of the cases referred to in support of my position, the particular question involved was as to the power of the wife, in seeking to dispose of her estate, to adopt any *other mode* than the one specially designated in the deed of settlement. In this case, however, the deed prescribes no particular mode, nor does it in terms give any power of sale. It simply conveys the property to the wife, and to the heirs of her body, coupled with the stipulation that it is "not to be subject to the control, or debts, or contracts of her husband." The Court, in their argument, admit that the deed creates a separate estate for the wife, but assume that it is not within the principle of the American cases which I have referred to, and in support of that assumption, cite a casual and vague remark of Chancellor Kent upon this subject. I am willing to submit the interpretation of that remark to any candid mind, and if it does not demonstrate pretty conclusively the inclination of the Chancellor to apply the doctrine to a case even of this kind, I will freely yield the argument. Upon the *principle* assumed in all of the American cases which I have cited, I am constrained to hold, that where the deed of settlement contains no power of disposal, the *jus disponendi* cannot be exercised by the wife, at least so as to take effect during her life, and that her interest in the property is restricted to the use merely. The case from 1 Barr is one in which there was *no particular* mode of

disposition prescribed, and is in all respects similar to the case before us. It is worthy of note that none of the American cases which profess to adhere to the English doctrine upon this subject, have had the boldness to carry it out to its legitimate results, when called upon to give it a practical application. However wrong in principle the English Courts may have been, it must be admitted that they have preserved the virtue of *consistency.* Holding as they do to the enlarged and unrestricted powers and capacities of the wife, they permit her not only to *alienate* but also to *charge* her separate estate, to any extent that she may desire. This is the current doctrine of those Courts.

The American Courts, however, are placed in this awkward dilemma. While they profess to look upon the wife, in respect to her separate estate, as discovert, and invested with *all* the rights and capacities of a *feme sole*, for the purpose of alienating her property, they yet shrink from permitting her to *charge* it, by her *general engagements.*— In other words, they accord to her absolutely the right to alienate—part with and destroy the *entire* estate, but she may not be permitted to do an act, which by *possibility* might deprive her of a portion of it. A doctrine which involves an inconsistency so glaring, cannot command my respect, and therefore will not receive my sanction.

In closing my observations upon this branch of the case, I may be permitted to remark with reference to the precedents cited and relied upon by the majority of the Court, that while age lends to truth a beauty and dignity, no accumulation of years can ever sanctify error. Influenced by this principle, the enlightened jurists of South Carolina, Pennsylvania, Tennessee and Mississippi, supported by the

approval of the great American Chancellor, have boldly repudiated the English doctrine, and 1 am content to be ranked as an humble follower of such worthy leaders.

In my observations upon the special point presented by this case, it will be perceived that I have left untouched many of the incidental questions which may arise out of this very delicate subject, such as the right to charge the separate estate of the wife for necessaries furnished for her use, or for expenses incurred for the benefit of the estate itself, and how and under what circumstances, such charges will be allowed to be made. Also the power of the Court of Equity to *alter or change* the nature of the property, upon the application of the parties interested therein, and many others which might be readily suggested. Indeed, the question as to the charging of the separate estate, for *necessaries and outlays*, has already been adjudicated by this Court in the case of " Administrator of Smith vs. Poythress," (2 Florida R., 92,) and the right is placed upon grounds which I fully approve of, and which are not at all in conflict with the general position which I have assumed in this case.

There is no conflict between the majority of the Court and myself, as to whether this deed created a separate estate for the wife. It is admitted that it did, and it might therefore be deemed out of place, were I to indulge in any lengthened observations upon this point. I shall content myself by briefly remarking that there is a great diversity of opinion in the reported cases, as to what partic. ular words will create a separate estate for the wife, but they all seem to concur in the adoption of this rule, that

54

where by the terms of the deed or settlement, *the intention to exclude the marital rights of the husband*, is clearly expressed or can be reasonably implied in such a case, a trust for the wife will be declared. No particular form of words is essential; the intention to exclude the legal rights of the husband, is all that is required to be shown. Clancy's Hus. and Wife, 262; 2 Bright's Hus. and Wife, 211; 2 Story's Eq. Jur., § 1381.

It was further insisted by the majority of the Court, that as the settlement upon the wife was executed in the State of Alabama, (the then residence of the husband and wife,) where, it is assumed, the English doctrine prevails as the law of the land, the doctrine of *ex loci contractus* would operate, and consequently the wife enjoyed the right to deal with the property as a *feme sole*, notwithstanding her subsequent removal into this State. There are two objections to this argument. In the first place I am not satisfied that the Court is correct as to the law of Alabama. It is stated in the American notes on "White and Tudor's Leading cases in Equity," (Vol. 1., p. 411,) that in the State of Alabama, some of the *earlier* cases inclined toward the English doctrine, and reference is specially made to Forest, et. al. vs. Robinson, Executor, 4 Porter, 44, and to Saddler and Wife vs. Houston and Gillespie. Ibid, 208. I have carefully examined the two cases referred to, and find that the broad question as made in this case, did not arise in either of them. In both of those cases, the application was on the part of a creditor to *charge* the separate estate, for the payment of *a debt of the wife*. What is said in those cases therefore, with respect to the general doctrine, must be, viewed as mere *dicta*. I have also examined all of the Al-

abama cases, from the first that was ever decided in the State, down to 6 Alabama Reports, and have found not one in which the point was expressly ruled.    The case from 17 Alabama, is clearly not in point.    In that case the deed of settlement provided that the wife should have " the complete control of the property, as *though the marriage had never taken place.*"    A stipulation evidently in favor of the right of alienation.    But even admitting the prevalence of the English doctrine in that State, yet the argument is wholly inapplicable to the case before us.    It is not the Alabama contract between Tate, the settler, and Mrs. Shomo, the beneficiary, that we are now called upon to adjudicate. The contract that we have to deal with, is the *Florida* contract, made between the beneficiary of the settlement and Bobe, the purchaser of the slaves.    It would certainly be extending the doctrine of *ex loci contractus*, to a most unreasonable lenght, to apply it to the circumstances of [this case, as is sought to be done by the majority of the Court. The argument, though at the first blush, somewhat speious, will upon examination, be found to be wholly untenable.

From the view which I have taken of the law of this case, it might seem unnecessary that I should refer to the testimony contained in the record, but inasmuch as the Court has assumed to base its judgment, in part upon the evidence, I may be permitted very briefly to refer to it. From the cursory examination which I have given to it, I am far from being fully satisfied, that there is that conclusiveness in it, which ought always to be required, whenever it is attempted to establish the fact of dealing against a married moman.    The evidence in this case very clearly

shows that, in the negotiation of the sale of the slaves, the wife had no participancy. She was never consulted by the purchaser, either as to her desire to sell, or in regard to the price to be paid, but the whole evidence conclusively shows that he dealt with the husband, as though he were the absolute owner of the property. I would not be understood as desiring to lay down any definite rule upon the subject, as each case must be made to depend upon its attendant circumstances, but I will say that where a *feme covert* is specially empowered to contract, a Court of Equity ought always to look with a jealous eye upon her dealings, with a view to · protect her from the operation of improper influences. And especially ought this to be so, whenever, as in this case, the party purchasing has full knowledge of the extent of the wife's interest in the property.

If I have exceeded the limits usually assigned to a dissenting opinion, my apology may be found first, in the intrinsic importance of the questions involved, and secondly, in the fact that the chief point in this case, has never before been brought under judicial investigation in this State. '

I am clearly of the opinion that the decre of the Circuit Court ought to have been *reversed* and the bill ordered to be dismissed,

Upon a full review of the whole case, my mind has arrived at the following conclusions, as applicable thereto :

1st. The appointment of a Trustee, is not indispensable to sustain a trust for the separate use of the wife, but where in a deed of settlement, the appointment has been

omitted, the husband will be converted into a trustee *pro hac vice.*

2nd. A married woman has no power to sell or dispose of her estate which has been settled upon her for her separate use, but what is specially given to her, by the very terms of the instrument, under which she claims.

3rd. Where the deed of settlement contains no power of disposal, the *jus desponendi* connot be exercised by her, at least so as to take effect in her life-time, her interest in the property being restricted to the use merely.

4th. Where by the terms of the deed or settlement, *the intention to exclude the marital rights of the husband,* is clearly expressed, or can be reasonably implied, in such a case, a trust for the wife will be declared. No particular form of words is essential, the *intention* to exclude the legal rights of the husband is all that is required to be shown.

5th. In cases where the *feme covert* is specially empowered to contract, a Court of Equity will always look with a jealous eye upon her dealings, with the view to protect her from the operation of improper influences.